AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

### DISTRICT OF Massachusetts

UNITED STATES OF AMERICA

**V.**

OUSSAMA ABDUL ZIADE

**CRIMINAL COMPLAINT**

CASE NUMBER: 05-M-0464-RBC

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief.  On or about ___ January-December 2002 ___ in ___ Norfolk and Suffolk ___ county, in the

___ District of ___ Massachusetts ___ defendant(s) did, (Track Statutory Language of Offense)

attempt to engage in transactions involving, and dealing in, the property and interests of property of a Specially Designated Global Terrorist, Yassin Kadi a/k/a "Yasin Al-Qadi", "Shaykh Yassin Abdullah Kadi," & "Yasin Kahdi",  in violation of 50 U.S.C. ss. 1701-1705 & Executive Order 13224; knowingly make a false statement for the purpose of influencing the action of the U.S. Small Business Administration ("SBA")  in a  loan application for Ptech, Inc., submitted to the SBA in January 2002, in violation of 18 U.S.C. s. 1014; & make false statements to special agents of the FBI, ICE, and IRS regarding a matter within the jurisdiction of the executive branch of the U.S. government in December 2002, in violation of 18 U.S.C. s. 1001,

in violation of Title ___ 50 ___ United States Code, Section(s) ___ 1701 & 1705; 18 U.S.C. s. 1014 & 1001(a)(2) ___ .

I further state that I am a(n) ___ Special Agent of ICE ___ and that this complaint is based on the following
<br>Official Title

facts:

See attached affidavit of Linda Hunt.

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

<br>Signature of Complainant

Sworn to before me and subscribed in my presence,

07-27-2005                                                     at                           Boston, Massachusetts
<br>Date                                                                                                   City and State

CHARLES B. SWARTWOOD, III
<br>United States Magistrate Judge
<br>Name & Title of Judicial Officer                                                      Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

CR# 05-M-0464-RBC

## AFFIDAVIT

I, Linda L. Hunt, a Senior Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, in Boston, Massachusetts, being duly sworn, depose and state:

## INTRODUCTION

1.  I am a Senior Special Agent employed by the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), formerly known as the United States Customs Service.  I have been an ICE/Customs Special Agent for approximately eighteen years.  I am currently assigned to the Financial Asset Identification and Removal Group at the office of the Special Agent in Charge for ICE in Boston, Massachusetts.  I have been involved in financial investigations for more than twelve years. In my capacity as a Special Agent, I have received training and gained experience in search and seizure, search warrant applications, criminal complaints, interviewing techniques, arrest procedures, terrorism, computer crimes, money laundering, fraud and various other crimes.  I have executed numerous affidavits in support of federal search warrants and criminal complaints.  I have also served as case agent on more than twenty cases investigating international money-laundering involving the international and domestic transfer of money and assets.  These investigations have focused upon various frauds and techniques utilized to deter law enforcement from identifying the true

1

ownership of assets and accounts. These techniques include the utilization of trusts, shell corporations, and persons acting in a nominee capacity.

2. The information contained in this affidavit is based upon my review of documents related to this investigation, including documents obtained via subpoena, records seized pursuant to the execution of a federal search warrants in Herndon, Virginia in March 2002 and at the offices of Ptech, Inc. ("Ptech"), in Quincy, Massachusetts in December, 2002, interviews conducted with various sources of information, and information furnished to me by other law enforcement agents, including Special Agents employed by the Federal Bureau of Investigation ("FBI"), Internal Revenue Service, Criminal Investigations ("IRS-CI"), and the U.S. Secret Service ("USSS").

3. I am submitting this affidavit in support of a criminal complaint charging OUSSAMA ABDUL ZIADE, former President and Chief Executive Officer of Ptech, with:

(a) attempting to engage in transactions involving the assets of Yassin Kadi, a Specially Designated Global Terrorist, which assets had been invested in Ptech, in violation of the provisions of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 and 1705 and Executive Order 13224;

(b) making false statements to the United States Small

2

Business Administration when Ptech applied in January

2002 for a loan through a program offered to assist

small businesses economically harmed by the attacks of

September 11, 2001 (hereinafter, "the 9/11 Loan") by

falsely representing the identities of Ptech's major

shareholders (those who owned twenty percent or more)

to knowingly and willfully conceal the interest in

Ptech held by Sarmany Limited, one of Kadi's nominee

companies, in violation of 18 U.S.C. § 1014;

(c) making false statements of material fact to special

agents of the FBI's Joint Terrorism Task Force, the Internal

Revenue Service, Criminal Investigations, and Immigration

and Customs Enforcement in December 2002 when he falsely

denied that he knew what ownership interests Kadi held in

Ptech.

This affidavit is submitted for the limited purpose of

establishing probable cause in support of the application for the

requested criminal complaint and associated arrest warrant.

Therefore, it does not set forth each and every fact that I have

learned during the course of this investigation.

## I.  **General Overview**

4.  Between on or about 1994 and 2001, Yassin Kadi a/k/a

"Shaykh Yassin Abdullah Kadi," "Yassin A. A. Kadi," "Yassin Al-

Kadi," "Yasin Kahdi," "Yasin Al-Qadi," and "Yassin Qadi" ("Kadi")

3

invested approximately $10,319,815 into Ptech, a computer software company located in Quincy, Massachusetts through companies he owned, controlled, or to which he was affiliated. As a result of these investments, Ptech issued common stock to Kadi's companies, Sarmany Limited ("Sarmany"), Caravan Company Limited a/k/a Caravan Development Group Limited ("Caravan"), Perdana Investments Limited ("Perdana"), Abrar Group International ("Abrar"), Sara Company Limited ("Sara"), and Grayson Group Limited ("Grayson"). As of October 12, 2001, the effective date of Kadi's designation as a Specially Designated Global Terrorist, Kadi indirectly owned and controlled a large percentage of Ptech common shares, representing a total investment of $10,319,815 in Ptech, and held that interest in the names of his nominee companies, including Sarmany and Caravan. ZIADE knew that Kadi owned Ptech stock through these nominee companies.

5. On October 12, 2001[1], the United States government designated Kadi as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order 13224 of September 23, 2001 ("Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism") promulgated pursuant to, among other authorities, IEEPA.

_____

[1]This designation was not published in the Federal Register until October 26, 2001.

6. As described below, under Executive Order 13224, all of Kadi's property or interest in property was blocked or frozen, and any transaction or dealing in Kadi's property or interest in property was prohibited. Accordingly, when Kadi was designated as a SDGT in October 2001, ZIADE as President and Chief Executive Officer of Ptech was required to freeze all assets, shares or property interests of Kadi, whether held himself or by any company with which he was affiliated, and was prohibited from conducting, attempting to conduct, or conspiring to engage in any transactions involving Kadi's or his company's Ptech stock.

7. ZIADE and other Ptech agents, knowingly and willfully failed to block Kadi's assets, and attempted to, and did engage in transactions involving those assets, in violation of the provisions of IEEPA, 50 U.S.C. §1705 and Executive Order 13224. Further, ZIADE and others made false statements to the U.S. Small Business Administration when Ptech applied in January 2002 for a 9/11 Loan by knowingly and willfully concealing the interest in Ptech held by Sarmany, one of Kadi's nominee companies, in violation of 18 U.S.C. § 1014. In addition, ZIADE made false material statements to Special Agents of the FBI's Joint Terrorism Task Force, the Internal Revenue Service, Criminal Investigations, and Immigration and Customs Enforcement in December 2002 when he falsely denied that he knew what ownership interests Kadi held in Ptech.

5

## II.  **Summary of the Law**

8.   Under IEEPA, 50 U.S.C. §1701-1705, the President has the authority "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy or economy of the United States."  50 U.S.C. § 1701.  The President deals with unusual or extraordinary threats through Executive Orders, which have the force and effect of law.  A violation of an Executive Order is an illegal act punishable under IEEPA, 50 U.S.C. § 1705(b).

9.   On September 23, 2001, pursuant to IEEPA, President Bush issued Executive Order 13224, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism."  It declared a national emergency to address the September 11 terrorist attacks, among other terrorist threats.  Executive Order 13224 directs that "all property and interests in property of [persons determined to be subject to the order] that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of the United States persons are blocked."

10.   Executive Order 13224 further specifically states that:

(a) any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to

6

this order or determined to be subject to this order[2];

(b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, **or attempts to violate**,[3] any of the prohibitions set forth in this order is prohibited; and

(c) any conspiracy formed to violate any of the

---

[2] Federal regulations enacted pursuant to IEEPA further describe the prohibited transactions as follows: "no property or interests in property of a specially designated [global] terrorist, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported, or otherwise dealt in." 31 C.F.R. § 595.201. Office of Foreign Asset Control ("OFAC") has broadly defined property interests as "an interest of any nature whatsoever, direct or indirect" of any property including "money, checks, drafts, bullion, bank deposits, saving accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership or indebtedness, . . . contracts of any nature whatsoever, and any other property real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." See 31 C.F.R. §595.307; 31 C.F.R. § 595.310. These regulations were promulgated by OFAC in August 1997 under Executive Order 12947, also enacted pursuant to IEEPA. The 1997 regulations (31 C.F.R. Part 595) outlined what OFAC considered a prohibited transaction. The sections of the 1997 regulations that contain the definitions of prohibited transactions and the terms property and interests in property are identical, with the exception of the use of the term specially designated terrorist versus specially designated global terrorist (emphasis added), to those enacted pursuant to E.O. 13224 in June 2003.

[3] In the First Circuit, an attempt occurs when a defendant intends to commit the substantive crime and takes a purposeful act that, under the circumstances as he believed them to be, amounted to a substantial step toward the commission of that crime and which strongly corroborates his criminal intent. United States v. Dworken, 855 F.2d 12, 16-19 (1st Cir. 1988).

7

prohibitions set forth in this order is prohibited.

11. On October 26, 2001, the Office of Foreign Asset Control ("OFAC"), a component of the U.S. Department of Treasury, published the designation of 45 individuals and 21 entities pursuant to the authority of Executive Order 13224. See 66 Federal Register 54404. Kadi was one of them, designated as follows:

AL-QADI, Yasin (a.k.a. KADI, Shaykh Yassin Abdullah; a.k.a. KAHDI, Yasin) Jeddah, Saudi Arabia (individual) [SDGT].

KADI, Shaykh Yassin Abdullah (see AL-QADI, Yasin) (individual) [SDGT].

KAHDI, Yasin (see AL-QADI, Yasin) (individual) [SDGT].

66 Federal Register at 54406, 55408.

12. Kadi's designation was effective at 8:00 a.m. on October 12, 2001. As discussed above, his designation made it illegal for any United States person or entity to conduct any transaction or dealing in property, or an interest in property, of Kadi in the United States.

13. Under Section 1014 of Title 18, it is illegal to make any false statement or report to the Small Business Administration in connection with a loan application for the purpose of influencing its action in any way. The maximum penalty for a violation of Section 1014 is 30 years imprisonment and a fine of $1,000,000. Similarly, Section 1001 of Title 18 prohibits the making of any materially false, fictitious, or

8

fraudulent statement or representation in any matter within the jurisdiction of the executive, legislative, or judicial branch of the U.S. Government. The maximum penalty for violation of Section 1001 is five years imprisonment and a fine of $250,000.

## III. Facts

### a. Ptech Established with Financial Assistance of Kadi

14. Ptech is a private, for-profit computer software company, that was incorporated in Massachusetts on February 2, 1994. Ptech's principal place of business has been located at 500 Victory Road in Quincy, Massachusetts. ZIADE is the President, Chief Executive Officer, and Chairman of the Board of Directors of Ptech.

15. Ptech has developed and sold systems management software to private businesses, individuals, and government agencies. Until approximately 1997, Ptech's main focus was research and development. Ptech spent approximately $20 million developing its products. These funds came primarily from Saudi Arabian investors, including Kadi.

16. ZIADE co-founded Ptech in 1994 with the capital financing provided by Kadi through one of his nominee companies, Sarmany Limited. Initially, in 1994, Kadi invested approximately $5 million in Ptech through Sarmany, an Isle of Man company he owned and controlled. In exchange, and pursuant to an authorization granted by Kadi and Sarmany's other director, Ptech

9

and Sarmany entered into a Stock Purchase Agreement on March 24, 1994, under which Ptech issued stock certificate number 3 to Sarmany representing 47,700 shares of Ptech common stock (53% of all of the issued and outstanding Ptech stock).

**b. Kadi's Investments in Ptech after its Establishment**

17. In or about November 1995, Caravan Company Limited a/k/a Caravan Development Group Limited, two related companies, one in the Isle of Man and the other in Malaysia, owned and controlled by Kadi, both referred to as "Caravan", invested $1.8 million in Ptech, bringing Kadi's total investment in Ptech to $6.8 million. In exchange for the investment, Ptech and Caravan entered into a Stock Purchase Agreement, which was signed by Kadi as Chairman and Director of Caravan, under which Ptech issued to Caravan on November 1, 1995 stock certificate number 4 representing 10,588 shares of Ptech common stock.

18. Between 1996 and 1998, Kadi also invested approximately $3 million more in Ptech through Perdana Investment Limited, Abrar Group International, and Sara Company Limited, companies he also owned and controlled, bringing his total investment in the company to more than $9.8 million. Later, Kadi transferred the Perdana and Abrar holdings to Caravan, another of Kadi's companies.

19. Between approximately January 15, 1996 and April 29, 1998, Kadi invested $2,211,935 in Ptech through Perdana. As a

10

result, Ptech issued Perdana 13,969 shares of Ptech common stock represented by four stock certificates.

20. On or about July 15, 1996, Kadi invested $648,000 in Ptech through Abrar. In exchange, Ptech issued stock certificate number 14 to Abrar representing 3,812 shares of Ptech common stock.

21. On or about April 29, 1998, Kadi invested $199,920 in Ptech through Sara, a Malaysian company he owned and controlled. On or about April 30, 1998, Kadi invested another $99,960 in Ptech through Sara. In exchange for these investments, Ptech issued Sara two stock certificates: number 23 in the amount of 1,176 common shares and number 38 in the amount of 588 common shares.

22. On or about September 23, 1998, at the request of Kadi, Abrar's Ptech stock certificate, certificate number 14, was transferred from Abrar to Caravan.

23. On February, 15, 1999, Kadi wrote a letter to ZIADE instructing ZIADE to transfer his holdings of Ptech stock in name of Perdana to Caravan. In this letter, signed by Kadi as the Chairman of Perdana, he states:

Perdana Investment (L) Limited is owned by Sheikh Yassin A. A. Kadi. The said company has decided to transfer the following Ptech Inc., shares to its associate Caravan Company (L) Limited, also owned by Sheikh Yassin A. A. Kadi. . . .

Immediately below these words was the following chart identifying

11

which Ptech shares and certificate numbers Kadi wished to
transfer from Perdana to Caravan:

| Date Issued | Certificate Number | Number of Common Stock (Shares) |
|---|---|---|
| 15-Jan-1996 | 13 | 5,882 |
| 15-Aug-1996 | 15 | 5,294 |
| 15-Aug-1996 | 20 | 294 |
| 29-Apr-1998 | 22 | 2,499 |
| | **TOTAL** | 13,969 |

24. As a result, Ptech transferred 13,969 of Perdana's
Ptech shares, representing Kadi's investment in Ptech through
Perdana of $2,211,935, to Caravan using stock certificate number
40. By February 1999, Kadi owned $4.65 million dollars worth of
Ptech common stock through Caravan.

25. In or about March to April 2000, Kadi made a
convertible loan in the amount of $360,000 to Ptech through
Grayson Group Limited, a company affiliated to Caravan that Kadi
owned and/or controlled. Grayson transferred this money to Ptech
via bank wires from Faisal Finance Switzerland. This loan was
convertible to shares of Ptech common stock. On or about June
29, 2001, Grayson's loan of $360,000 was converted to 2,118
shares of Ptech stock.

26. In summary, by June 2001, Kadi had invested $10,319,815
in Ptech.

27. By the time of his designation in October 2001, Kadi

12

owned or had a direct or beneficial interest[4] in 55,800[5] shares
of Ptech common stock through Sarmany, which represented
approximately 34% of Ptech's outstanding issued shares; 28,369
shares of Ptech common stock through Caravan; 1,765 shares of
Ptech common stock through Sara; and 2,118 shares of Ptech common
stock through Grayson.  In total, by October 12, 2001, the date
of Kadi's designation as a SDGT, Kadi indirectly owned through
his nominee companies 88,051[6] shares of Ptech common stock, which
represented more than 50% of Ptech's outstanding issued shares.

**c.   Kadi's Significant Role in the Operation of Ptech**

28.  As a result of his substantial investments in Ptech,
Kadi involved himself in the operation and management of Ptech.
Kadi served as a director of Ptech from approximately March 1995

---

[4] Although Kadi transferred his ownership interests in some
of these companies to his wife and son in 1999, he continued to
exert control over his Ptech investments and by October 2001 had
at least a beneficial interest in them, which is all that IEEPA
requires.  For instance, although he formally transferred his
ownership interest in Sarmany and Caravan (Isle of Man) to his
wife and son, Kadi remained a director of Caravan (Isle of Man)
until October 15, 2001 and a director of Sarmany until April
2002.  Kadi also continues to this day to serve as a director and
shareholder of Sara.

[5] On March 4, 1999, Ptech transferred 8,100 common shares
from Omega Integrated Information Systems to Sarmany pursuant to
Kadi's instructions.

[6] By that time, Ptech had issued a total of 165,036 shares of
common stock.

13

until at least 1998[7] and attended several Board of Director
meetings in his capacity as a director and/or investor.  For
instance, Kadi attended Ptech's Board of Director meeting held in
Jeddah, Saudi Arabia (where Kadi's residence and some of his
businesses are located) on March 22, 1998.  The minutes of this
meeting are signed by ZIADE, Kadi, and another Ptech director.
They reflect that the Board decided, among other things, that
Perdana, one of Kadi's companies, would pay "$261,445.00 for all
lease obligations of Ptech, Inc. outstanding with BMI Leasing
Inc. of Secaucus, New Jersey."  At another Ptech Board of
Director meeting held on November 3, 1998, Kadi and another Saudi
Arabian investor agreed to help raise two million dollars for
Ptech by January 1999.

     29.  ZIADE considered Kadi a partner in his Ptech "venture"
as well as a "key member of the [B]oard" of Directors.  In a
letter to Kadi dated July 27, 1997 requesting advice about
business development, ZIADE stated:

> You are the major shareholder as well as a key member
> of the board.  We have to do this together and I need
> to have access to you, at least to brainstorm in a
> difficult situation.  Between you and myself we own
> more than 80% of the company.  Therefore you and then
> myself have the most to gain or lose in this company.

---

[7]In his April 1999 curriculum vitae maintained by the
Vakfuska Bank in Sarajevo, Kadi indicated that he held "large
interests in capital investment in risky projects - Ptech Inc. -
Boston, Massachusetts, USA" and was at that time serving as a
director of Ptech.

Over the years 1996-1998, ZIADE wrote similar letters, emails, and facsimiles to Kadi. In these communications, ZIADE repeatedly thanked Kadi for his support, recognized his assistance, and requested more money to pay Ptech's debts and expenses. For example, on April 21, 1996, ZIADE wrote to Kadi:

As you told me last time we spoke, 'this is the last time I will help you in getting cash, after that you have to look for other alternative in USA.' We will take that effort now, but we will appreciate any help. . . . Remember the first day that we met in Westborough, I told [you] about my dreams, and I asked you are you going to be able to support me to go through this. . . . And you have been supportive. Do not let anything get between you and your goodwill. I have been working for the past years to put this company together. You and I did not want me to be alone in this venture. You wanted me to build a team, and I did. . . . I will never forget your support and encouragement, and with God will, I will not fail you.

In addition to these written communications, ZIADE and Kadi also had frequent telephone conversations while Kadi served on Ptech's Board of Directors.

30. Prior to his designation in October 2001, ZIADE and Ptech's directors communicated with Kadi via telephone concerning operational and financial matters relating to Ptech. ZIADE and other Ptech officers and directors also sent and copied Kadi and/or his chief financial accountant or financial advisor, emails regarding the management of Ptech using the email address **yassin@caravangroup.com**. From on or about 1996 until 2001, ZIADE (and occasionally other Ptech employees at ZIADE's direction) routinely sent Kadi by facsimile or email Ptech's monthly and

quarterly financial statements.  For instance, on December 13, 2000, ZIADE sent Kadi via email a copy of Ptech's financial statement for the period of January to November 2000 and on January 2, 2001, in an email he entitled "Dec another Good Result", ZIADE advised Kadi of the monthly revenue numbers for December 2000 and the annual revenue numbers for 2000.

31.  Even after he resigned from the Board of Directors, Kadi remained actively involved in the operation and management of Ptech.  Kadi hosted and participated in several Ptech business meetings in Saudi Arabia from 1999 through 2001.  For instance, in February 1999, several meetings were held in Saudi Arabia with Kadi, including one at Kadi's home, at which discussions about the financing of Ptech, the marketing of Ptech products, and other business matters took place.  In January 2001, ZIADE and others met with Kadi in Kadi's office in Saudi Arabia to discuss a possible Ptech restructuring, a review of Ptech's financial situation and business operation in 2000, Ptech's 2001 strategy, and an update on the hiring of a Chief Financial Officer.  Kadi also assisted Ptech in his efforts to raise financing for Ptech in the Middle East.

32.  ZIADE and Ptech's directors also frequently sought Kadi's advice and approval on important financial and operational

16

matters after Kadi resigned from Ptech's Board of Directors[8].
These included the following:

a. In March and April, 2000, in response to financial
difficulties Ptech was experiencing, Kadi loaned Ptech
$360,000 through Grayson, a company Kadi controlled. In May
2001, ZIADE had several conversations with Kadi via
telephone concerning the conversion of his $360,000 loan to
Ptech shares.

b. In December 2000, ZIADE had at least two conversations
with Kadi about Ptech during which the following topics were
discussed: the appointment of one of Kadi's associates, a
Pakistani born United States citizen, to Ptech's Board of
Directors to represent the interests of the Saudi Arabian
investors; restructuring Ptech; finalizing the decision on
the hiring of a new Chief Financial Officer and related
negotiations with the candidate; and Ptech's cash flow
projections.

c. As a result of Kadi's request for representation on
Ptech's Board of Directors, on or about February 11, 2001,
Kadi's associate was appointed as a director of Ptech.

d. Because Ptech was experiencing financial difficulties at

---

[8]Kadi also solicited advice from ZIADE. In an email dated
November 21, 2000, ZIADE provided Kadi with financial advice
concerning a potential investment in another company, Inzigo,
Inc.

17

that time, on or about December 13, 2000, ZIADE requested
and Kadi agreed to make arrangements for Ptech to receive a
$300,000 loan.

e. Between in or about May and July 2001, Kadi was included
in oral and written (via email) discussions concerning a new
potential licensing agreement between Ptech and Horizons
Software Development, an Egyptian company.

f. Between in or about April and June 2001, Ptech
considered acquiring a Canadian company, Process Renewal
Group ("PRG"). Kadi was included in these negotiations. In
fact, ZIADE advised the President of PRG that he would have
to meet the "real owners" of Ptech in Saudi Arabia before
the deal could be approved. Thereafter, in June, 2001, the
President of PRG traveled to Saudi Arabia and met with Kadi
and another Saudi Arabian Ptech investor to negotiate the
sale (despite these negotiations, the sale did not
materialize).

g. As late as August 9, 2001, Ptech's Chief Operating
Officer ("COO") sent Kadi an email, on behalf of ZIADE,
containing information regarding a confidential executive
summary of the Ptech business plan, a potential consulting
contract, and information on Ptech's efforts to raise $15
million in financing. This email was sent to Kadi and
another Saudi Arabian investor. In this message, on which

18

ZIADE was copied, the COO stated: "Oussama is in Lebanon and is having some difficulty with Internet access.  For this reason he asked me to forward on to you an update on our progress at Ptech.  He also asked me to ensure that Yassin also receives this information. . . ."  The COO further described the progress on the potential PRG acquisition and concluded the email: "We all appreciate your continuing interest and support for Ptech."

h.   Ptech's employees at Ziade's direction routinely provided financial statements and other business reports to Kadi's financial advisors.

### d.   ZIADE's Knowledge of Kadi's Ownership of Ptech Shares and Involvement in its Operations

33.   Prior to Kadi's designation as a SDGT, ZIADE, Ptech's co-founder and its only President and CEO, had knowledge of all of Ptech's investors and specifically knew Kadi had invested approximately \$10 million dollars in Ptech through foreign companies he owned and/or controlled.[9]  ZIADE personally maintained copies of the original stock purchase agreements and transfer requests signed by Kadi.  ZIADE also maintained and edited stock ownership records in the form of capitalization tables on his computer, which demonstrated that Kadi's companies owned a majority of Ptech's outstanding issued shares.

---

[9]From its inception in 1994 to October 2001, Ptech had only issued 53 stock certificates over a period of eight years.

34. Two financial documents created by ZIADE and maintained on his computer prior to the government's search of Ptech in December 2002, identify Kadi as a Ptech investor whose total investment in the company was approximately $10 million dollars. In one document created on or about December 17, 1999, ZIADE indicated that Kadi invested $9.65 million in Ptech, Kadi's family invested $0.2 million, and Kadi's friends invested $1.7 million. In another document, created on or about November 29, 2001, entitled "New CAPITAL2 Analysis", ZIADE identified Kadi as having invested, and owning Ptech shares worth, $9,959,810 through Sarmany, Caravan, and Sara. Similarly, in a document entitled "Stock Dustribution" created by ZIADE on or about September 26, 2000, ZIADE listed Kadi as an owner of 98,100 Ptech shares while he identified himself and Ptech management as owning 153,036 shares.

35. ZIADE communicated with Kadi or his financial advisors about a number of financial matters concerning Ptech, including the amount of Ptech shares Kadi owned and names under which Kadi held his Ptech shares. For instance, on March 11, 2001, Kadi's chief financial accountant informed ZIADE by email that Kadi was considering the further consolidation of his holdings of Ptech shares. Kadi's accountant advised ZIADE:

Sheikh Yassin A. Kadi is considering the consolidation
of his holdings into one offshore company account.
Currently, the majority of shares of Ptech are held in
the name of Sarmany Limited. Sheikh Yassin A. Kadi now

20

wants to transfer all the shares owned by Sarmany Limited to either Caravan Development Group Limited or Loxhall Limited, without passing of any actual consideration.  Sarmany, Caravan, and Loxhall are Isle of Man, nonresident offshore companies.

36.  As discussed above, Kadi made a $360,000 loan to Ptech through Grayson in March and April 2000.  In May 2001, ZIADE had several conversations with Kadi via telephone concerning the conversion of this $360,000 loan to Ptech shares.  ZIADE documented one of his telephone conversations with Kadi in an email to Kadi's associate on the Board of Directors dated May 15, 2001.  In this email, ZIADE admitted that "[a]s per our records the whole of US $360,000 was injected as convertible loan @ $170 per share by Sheikh Yassin A. Kadi."  ZIADE further indicated that Ptech shares would be issued to Kadi in the name of Grayson after two issues had been worked out with the Ptech Board.  ZIADE also referenced Kadi's assistance in helping to raise over $2 million dollars from investors after February 1999.  In closing, ZIADE stated: "I think these two issues need to be resolved by the Board as soon as we can so we can make Yassin happy."

37.  Significantly, in January 2001, during a disagreement with Ptech's Saudi Arabian shareholders concerning Ptech's serious financial instability and the proposed replacement of ZIADE as Ptech's President and Chairman, ZIADE wrote emails in which he noted that Kadi was a majority shareholder of Ptech and was extensively involved with the management of the company.  On

21

January 22, 2001, in an email to one of Kadi's financial advisors, ZIADE stated:

> Yassin made a mistake in buying a majority of Ptech to
> start with, but did not have the mean[s] to defend the
> company[.] [E]ven he knew that this - as it was put for
> him then - [was] an effort that will require $25M and 5
> years.  This put all the load on him. . . . Yassin is
> emotional - much more than me - but [he] ha[s] good
> instinct[s], we need always to influence him
> positively.  Leave out of the negative influence.  Not
> because you get upset [with] me, and you and Saied
> decided that [the] CEO has to be changed, you go and
> convince him [of] that.  We are not going to go
> anywhere with this.

38.  Over the years 1995 through 2002, Kadi and his chief financial accountant also sent ZIADE correspondence on letterhead bearing the name "Yassin A. Kadi Est." or which used Kadi's address of P.O. Box 214, Jeddah 21411, Saudi Arabia.

**e.   ZIADE and Ptech Learns of Kadi's Designation as a SDGT**

39.  On October 18, 2001, ZIADE downloaded from the internet a copy of an article from the Chicago Tribune regarding Kadi's designation as a SDGT.  The article specifically stated that Kadi's name was included on a list of "individuals and groups accused of supporting Al Qaeda."

40.  On November 8, 2001, ZIADE visited OFAC's website and downloaded a copy of Executive Order 13224 with the list of people and entities designated as Specially Designated Global Terrorists as of that date.  This list included Kadi's name and indicated he had been designated as a SDGT on October 12, 2001. The designation list, maintained on OFAC's website, advised the

22

public to contact OFAC for more information about sanctions involving transactions with designated terrorists and provided a telephone number.

41. Ptech did not contact OFAC through any of its officers, directors, employees, or agents to request a license to transact business or engage in any transactions involving the assets of Kadi, a SDGT.

### f. Steps taken to conceal Kadi's Property and/or Interests in Ptech

42. From October 2001 through March 2002, several discussions occurred and meetings were held among ZIADE and other members of Ptech management concerning Kadi's designation.

43. During one meeting with a Ptech former employee, ZIADE described various steps that had been taken to conceal Kadi's ownership interest in Ptech and that Kadi's equity interest in Ptech had been transferred to his son. Further, ZIADE stated that there was no trail linking Kadi to Ptech because Kadi never owned any Ptech shares in his own name.

44. Additionally, a witness has reported that during one management meeting in or about November 2001, ZIADE and other members of Ptech management, based upon the advice of its corporate counsel, decided to conceal from the government and the public Kadi's indirect ownership of Ptech stock through his nominee companies.

### g.    Ziade Engages in Prohibited Transactions Involving Kadi's Property and/or Interests in Ptech

45.    On January 15, 2002, three months after Kadi's designation as a SDGT, Ziade established a new corporation, Ptech, Inc., in Delaware. In February 2002, Ziade Ptech, Inc. (MA), was merged with Ptech, Inc. (DE), with Ptech, Inc. (DE) being designated as the surviving corporation.[10]   According to the Plan of Merger, and Articles of Incorporation and Bylaws for Ptech, Inc. (DE), Ptech's agents advised the shareholders of the Massachusetts entity that their shares of common stock would be converted into preferred A shares of the Delaware entity. Accordingly, the Massachusetts shareholders were instructed to return their Ptech stock certificates and advised that new stock certificates in the name of the Delaware entity would be issued.

46.    Based upon a desire of Ptech's Board of Directors ("BOD") to "fix the foreign ownership issue" (identified as an agenda item at the BOD meeting of December 18, 2001), ZIADE drafted clustering proposals whereby Sarmany (a Kadi controlled company) would transfer its Ptech shares to other entities.    In a final proposal, entitled "Shareholding Clustering Proposal", dated April 18, 2002, ZIADE proposed that Sarmany transfer all of its Ptech shares to three entities in the following amounts:

---

[10]ZIADE acknowledged to one former Ptech employee that the Delaware merger was a way "to go around the problem" (the Kadi designation problem).

Bective Limited - 24,000 shares; Arkday Limited - 17,700 shares; Grayson Group Limited 14,100 shares.[11]

47.   On April 24, 2002, Sarmany[12], with the assistance of Kadi's chief financial accountant, at the advice of ZIADE, transferred Sarmany Limited's entire property interest in Ptech (55,800 shares of Ptech common stock) to three entities: Bective Limited; Arkday Limited; and Grayson Group Limited. Specifically, as ZIADE had proposed, Sarmany transferred 24,000 Ptech shares to Bective Limited; 17,700 Ptech shares to Arkday Limited; and 14,100 Ptech shares to Grayson Group. ZIADE assisted Sarmany with this stock transfer by nullifying the old shareholder (Sarmany) agreements and stock certificates on its books and transferring Sarmany's stock interests on Ptech's capitalization tables to the new shareholders (Bective, Arkday, and Grayson).[13]   ZIADE also advised Kadi's chief financial

---

[11]This clustering proposal also proposed that Sara transfer all of its 1,764 Ptech shares to Arkday Limited.

[12]On April 15, 2002, Kadi notified Sarmany's Board of Directors, which only consisted of one person besides himself, of his immediate resignation from the Board.  Kadi's chief financial accountant, employed at Kadi's companies including Yassin A. Kadi Establishment, continued to exercise control over Sarmany.  In April 1999, Kadi had transferred his 50% ownership interest in Sarmany to Ilana Limited, a company owned by his wife and son.

[13]Like Sarmany, on or about April 24, 2002, Sara, as Ptech had proposed, transferred its 1,764 Ptech shares to Arkday Limited.  This transfer was reflected in Ptech's capitalization records.  On April 24, 2002, Kadi was a director and shareholder of Sara.  Based upon Sara's corporate records, Kadi's status as director and shareholder has not changed since April 2002.

25

accountant he would issue new stock certificates to the new
shareholders based upon the final clustering proposal.

48.   As a result, Sarmany was never identified as an owner
of stock of the Delaware entity.  Sarmany's shares were
transferred to the three new entities, who replaced Sarmany, at
the conversion rate[14] given to the original Massachusetts
shareholders.  Accordingly, Bective became an owner of 3,600,000
Preferred A shares of Ptech (DE), Arkday became an owner of
3,671,400[15] Preferred A shares of Ptech (DE), and Grayson became
an owner of 2,160,000 Preferred A shares of Ptech (DE).

## h.   ZIADE Made False Statements to U.S. Small Business Administration

49.   ZIADE made false statements, in violation of 18 U.S.C.
§1014, on an application for a loan from the U.S. Small Business
Administration ("SBA") under a program designed to assist
business adversely affected by the September 11, 2001 terrorist
attacks.

50.   In January 2002, Ptech submitted a loan application to
the SBA for $650,000 under the Expanded Economic Injury Disaster

---

[14]As a result of the merger, each share of Ptech (MA) common
stock was converted into 150 shares of Preferred A shares of
Ptech (DE).

[15]This amount also includes Ptech (MA) common shares
transferred on or about April 24, 2002 from Sara Company Limited,
Kadi's wife, Kadi's family members, and Caravan Development
Limited to Arkday and converted to Preferred A shares of Ptech
(DE).

Loan Program, a program created to help small businesses economically harmed by "the destruction of the World Trade Center or damage to the Pentagon on September 11, 2001".

51. The SBA instructed Ptech, orally and in writing, that it was required, in its application, to provide the names of any individual or entity that owned 20% or more of Ptech. Notwithstanding this instruction, ZIADE and Ptech's COO concealed the fact that Sarmany owned 20% or more of Ptech stock at the time of its application for the 9/11 loan in January 2002. This omission is directly contradicted by each tax return filed by Ptech for years 1994-2000, which identify Sarmany as a foreign entity owning 25% or more of Ptech stock. In January 2002, Sarmany owned approximately 34% of Ptech's common shares.

52. ZIADE created a new capitalization ("cap") or stock ownership table on his laptop for the sole purpose of being used as an exhibit to the SBA loan application. This table omitted Sarmany from the list of owners of Ptech shares, even though other existing cap tables maintained by ZIADE dated prior to and after January 2002 (the date of the SBA loan application), and also maintained on his laptop, listed Sarmany as the largest single shareholder owning 55,800 Ptech shares, which represented between 33.82 and 35.3% of Ptech's total outstanding common shares.

53. Both ZIADE and Ptech's COO signed the application. By

signing the application, both ZIADE and Ptech's COO certified

that

> All information in this application is true and
> complete to the best of my knowledge. All financial
> statements submitted with this application fully and
> accurately present the financial position of the
> business. I have not omitted any disclosures in these
> financial statements. This certification also applies
> to any financial statements submitted after this date.
> I understand that false statements may result in the
> forfeiture of benefits and possible prosecution by the
> U.S. Attorney General (reference 18 U.S.C. § 1001
> and/or 15 U.S.C. § 645).

54. Ptech's SBA loan application was not approved for

various reasons including, but not limited to, Ptech's inability

to establish future profitability and the existence of a federal

criminal investigation of the company and its agents. This does

not affect ZIADE's criminal liability; he violated 18 U.S.C. §

1014 when he falsely stated the identities of Ptech stockholders

and omitted the name Sarmany.

## i.   **ZIADE Makes False Statements to Prosecutors and Law Enforcement**

55. On December 5, 2002, ZIADE, represented by counsel, met

with prosecutors and law enforcement agents involved in the

investigation of Ptech in Boston. Pursuant to a proffer

agreement, ZIADE made the following statements, which he knew to

be false: (1) he had no knowledge of Kadi's position in Grayson

Group; (2) he was never conclusively able to determine whether

Kadi had invested any of his own money into Ptech; (3) he did not

have any paperwork disclosing that Kadi had invested any of his
own money into Ptech; and (4) approximately five months
previously (July 2002), ZIADE first learned that Kadi had more of
a connection with Caravan than he originally believed.

56.   ZIADE knew in December 2002 that Kadi was involved in
the management and operations of Ptech from the time that Kadi
initially invested $5 million dollars into the company in 1994.
ZIADE knew Kadi remained involved in the management of Ptech
until he was designated as a SDGT in October 2001.  Over the
years, ZIADE had met with Kadi in Saudi Arabia about Ptech, and
communicated with Kadi via telephone and email.  ZIADE had also
communicated with Kadi's financial advisors regarding Kadi's
holdings in Ptech shares and under what companies names he held
them.

57.   Additionally, when he was interviewed by law
enforcement in December 2002, ZIADE knew that he had electronic
and paper documents in his possession at his office and on his
computer that demonstrated that Kadi had directly invested
millions of dollars in Ptech, many of which he himself had
created.

58.   ZIADE also knew Kadi owned or controlled Grayson Group.
In 1999, ZIADE and Kadi had discussed Kadi making a loan to Ptech
in 2000 through Grayson that would be convertible to Ptech shares
at a later date.  Kadi in fact made this loan to Ptech in 2000.

Subsequently, as a result of discussions with Kadi in 2001, ZIADE converted the loan to 2,118 Ptech shares. In an email to one of Ptech's directors, ZIADE admits "[a]s per our records the whole of US $360,000 was injected as convertible loan @ $170 per share by Sheikh Yassin A. Kadi." Thus, ZIADE knew in December 2002 that Kadi controlled and/or owned Grayson Group, the entity through which Kadi made a loan to Ptech in 2000.

## CONCLUSION

47. Based upon the above, and on my training and experience, I have probable cause to believe, and do in fact believe, that OUSSAMA ABDUL ZIADE:

> (a) attempted to engage in transactions involving the assets of Yassin Kadi, a Specially Designated Global Terrorist, which assets had been invested in Ptech, in violation of the provisions of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 and 1705 and Executive Order 13224;

> (b) made false statements to the United States Small Business Administration when Ptech applied in January 2002 for a loan through a program offered to assist small businesses economically harmed by the attacks of September 11, 2001 (hereinafter, "the 9/11 Loan") by falsely representing the identities of Ptech's major shareholders (those who owned twenty percent or more) to knowingly and

30

willfully conceal the interest in Ptech held by Sarmany, one

of Kadi's nominee companies, in violation of 18 U.S.C. §

1014;

(c) made false statements of material fact to special agents

of the FBI's Joint Terrorism Task Force, the Internal

Revenue Service, Criminal Investigations, and Immigration

and Customs Enforcement in December 2002 when he falsely

denied that he knew what interests Kadi held in Ptech prior

to his designation as a SDGT.

LINDA HUNT
Special Agent
Immigration and Customs Enforcement

Sworn to me and subscribed in my presence this 27th day of
July 2005.

CHARLES B. SWARTWOOD III
United States Magistrate
Judge

31

JS 45 (5/97) - (Revised USAO MA 6/29/04)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |

**Place of Offense:** Massachusetts    **Category No.** II_____    **Investigating Agency** ICE/FBI/IRS_____

**City** Quincy and Boston_____    **Related Case Information:**

**County** Norfolk and Suffolk_____

Superseding Ind./ Inf. _____    Case No. _____
Same Defendant _____ New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number    2002M-0461-RBC_____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   OUSSAMA ABDUL ZIADE_____    Juvenile    ☐ Yes    ☒ No

Alias Name _____

Address _____

Birth date (Year only):   1964   SSN (last 4 #):   3765   Sex  M  Race: _____ Nationality:   Lebanese_____

**Defense Counsel if known:**   **Martin Richey**_____    **Address:   Federal Defender Office**_____
**408 Atlantic Ave., Boston, MA**_____

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**   **B. Stephanie Siegmann**_____    **Bar Number if applicable** _____

**Interpreter:**    ☐ Yes  ☒ No    List language and/or dialect: _____

**Matter to be SEALED:**    ☒ Yes    ☐ No

☒ **Warrant Requested**    ☐ **Regular Process**    ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____    ☐ Serving Sentence    ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**    ☒ **Complaint**    ☐ **Information**    ☐ **Indictment**

**Total # of Counts:**    ☐ **Petty** _____    ☐ **Misdemeanor** _____    ☒ **Felony   3**_____

**Continue on Page 2 for Entry of U.S.C. Citations**

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:   July 27, 2005**    **Signature of AUSA:** _____

JS 45  (5/97) - (Revised USAO MA 3/25/02)  Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant**    OUSSAMA ABDUL ZIADE

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| **Set 1**  50 U.S.C. §§ 1701 & 1705 | International Emergency Economic Powers Act | 1 |
| **Set 2**  18 U.S.C. § 1014 | Making False Statements to SBA | 2 |
| **Set 3**  18 U.S.C. § 1001(a)(2) | Making False Statements | 3 |
| **Set 4** | | |
| **Set 5** | | |
| **Set 6** | | |
| **Set 7** | | |
| **Set 8** | | |
| **Set 9** | | |
| **Set 10** | | |
| **Set 11** | | |
| **Set 12** | | |
| **Set 13** | | |
| **Set 14** | | |
| **Set 15** | | |

**ADDITIONAL INFORMATION:**